**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RGT HOLDINGS, INC., derivatively on behalf of TICKET RESERVE, INC., | § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| RICHARD M. HARMON, ASH NARAYAN, HERBERT L. RUDOY, AND JOHN A. KAPTROSKY | § § § | Case No. _____ |
| Defendants | § § | |
| -and- | § § | |
| THE TICKET RESERVE, INC., an Illinois corporation, d/b/a Forward Market Media | § § § | |
| Nominal Defendant. | § § § § | |

_____

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**
_____

Plaintiff RGT Holdings, Inc. ("Plaintiff" or "RGT"), derivatively on behalf of The Ticket Reserve, Inc. d/b/a Forward Market Media (the "Company" or "Ticket Reserve"), files this Verified Shareholder Derivative Complaint against Individual Defendants Richard M. Harmon, Ash Narayan, Herbert L. Rudoy, and John A. Kaptrosky (collectively, the "Individual Defendants") for breaches of their fiduciary duties and other misconduct as directors and/or officers of Ticket Reserve. In support thereof, Plaintiff states as follows:

**NATURE OF THE ACTION**

1.     This is a shareholder derivative action which seeks to remedy wrongdoing committed by Ticket Reserve directors and officers between July 8, 2005 and the present. During

1

this time, as officers and directors of Ticket Reserve, the Individual Defendants breached their fiduciary duties to Ticket Reserve, breached their duty of due care, committed gross mismanagement, and were unjustly enriched by their wrongful conduct.

2.     By reason of their positions as directors and officers of Ticket Reserve and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Ticket Reserve and its shareholders fiduciary obligations of good faith and loyalty, and were and are required to administer the Company's affairs for the common benefit of all shareholders and exercise their best care, skill and judgment solely in the interest of Ticket Reserve, and not in furtherance of their personal interest or benefit.  The Individual Defendants were and are required to exercise the degree of care which a prudent individual, prompted by self-interest, would exercise in the management of his or her own affairs.  The Individual Defendants were and are required to use their utmost ability to control and manage Ticket Reserve in a fair, just, honest and equitable manner and in a manner that preserved, rather than wasted, corporate property and assets.

3.     The Individual Defendants breached their fiduciary duties to Ticket Reserve and its shareholders by engaging in, ratifying and/or failing to prevent the following conduct:

   (a)   Grossly mismanaging Ticket Reserve's financial affairs and wasting of corporate assets, including but not limited to:

      (i)   incurring excessive debt with no reasonable expectation of being able to repay it;

      (ii)  incurring excessive debt that could only be repaid by incurring debt to other parties;

(iii)   incurring excessive debt that could only be repaid through issuance of equity in Ticket Reserve, resulting in the dilution of equity interests held by other shareholders;

(iv)   incurring excessive debt on economically unreasonable terms from the perspective of Ticket Reserve, including exorbitant interest rates, excessive loan extension fees and unduly burdensome security requirements; and

(v)   paying undisclosed finder's fees, issuing Company stock, issuing options to purchase additional Company stock and executing promissory notes to board member Ash Narayan for procurement of investors and lenders.

(b)   Failing to disclose material information to investors concerning the financial condition of Ticket Reserve and the purpose of their loans or other investments;

(c)   Making material misrepresentations to investors concerning the financial condition of Ticket Reserve and the purpose of their loans or investments; and

(d)   Failing to disclose to investors or potential investors substantial compensation to director Ash Narayan, including cash payments, stock in Ticket Reserve, an option to purchase additional Ticket Reserve stock and a $1,000,000 promissory note payable by Ticket Reserve.

4.   The above described misconduct constitutes breaches of fiduciary duties, breach of the duty of due care, and gross mismanagement.

5.     Plaintiff brings this action derivatively in the right and for the benefit of Ticket Reserve to redress injuries suffered, and to be suffered, by Ticket Reserve as a direct result of the Individual Defendants' breaches of fiduciary duties, breach of the duty of due care, gross mismanagement, and unjust enrichment.  Ticket Reserve is named as a nominal defendant solely in a derivative capacity.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity among the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 1401 because (a) Ticket Reserve maintains its principal executive offices in this district, (b) one or more of the Individual Defendants resides in this district, (c) a substantial portion of the transactions and wrongs complained of herein—including the Individual Defendants' primary participation in the wrongful acts—occurred in this district, (d) the Individual Defendants have received substantial compensation in this district by doing business here and engaging in numerous activities that had an effect in this district and (e) because venue would have been proper in this district if Ticket Reserve itself had instituted this action against the Individual Defendants.

8.     This Court has personal jurisdiction over Ticket Reserve and all Individual Defendants.

9.     The Court has general personal jurisdiction over Ticket Reserve because (a) Ticket Reserve is incorporated in the State of Illinois, (b) Ticket Reserve's principal place of business is

in the State of Illinois, and (c) Ticket Reserve carries on a continuous and systematic part of its business in the State of Illinois.

10.     The Court likewise has general personal jurisdiction over Individual Defendants Harmon, Rudoy and Kaptrosky because they are citizens of and domiciled in the State of Illinois.

11.     This Court has specific personal jurisdiction over all of the Defendants because they are amenable to service of process by an Illinois court and because they have engaged in business in the State of Illinois from which claims in this lawsuit arise.  Moreover, each of the Defendants, through the conduct described herein, have purposefully directed their own conduct toward the State of Illinois.  Thus, the Defendants have purposefully established the necessary minimum contacts with the State of Illinois such that it was foreseeable and the Defendants should have reasonably anticipated being haled into court in this State. Further, based on the Defendants' contact with this state, maintenance of this suit does not offend the traditional notions of fair play and substantial justice.

## PARTIES

12.     Plaintiff RGT Holdings, Inc. is a Texas corporation with its principal place of business in Dallas, Texas.  RGT is a citizen of the State of Texas.  RGT became a shareholder of Ticket Reserve on July 8, 2005, and has continuously held its Ticket Reserve stock at all relevant times.   Plaintiff brings this action derivatively in the right and for the benefit of Ticket Reserve and will adequately represent the interests of Ticket Reserve in enforcing its rights as well as the shareholders of Ticket Reserve who are similarly situated.

13.     Nominal Defendant The Ticket Reserve, Inc. is an Illinois corporation[1] with its principal place of business located at 1109 S Wolf Rd Hngr 8-2b, Wheeling, IL 60090.  Ticket Reserve is a citizen of the State of Illinois.

14.     Individual Defendant Richard M. Harmon is the Chief Executive Officer and Chairman of the Board of Directors of Ticket Reserve.  Mr. Harmon is a citizen of the State of Illinois and his address is 2055 W. Saunders Rd., Lake Forest, IL 60045.

15.     Individual Defendant Ash Narayan is a member of the Board of Directors of Ticket Reserve.  Mr. Narayan is a citizen of the State of California and his address is 6 Tidal Surf, Newport Coast, CA 92657.

16.     Individual Defendant Herbert L. Rudoy is a member of the Board of Directors of Ticket Reserve.  Mr. Rudoy is a citizen of the State of Illinois and his address is 1923 N. Hudson Ave., Chicago, IL 60614.

17.     Individual Defendant John A. Kaptrosky is the Secretary and Chief Operating Officer of Ticket Reserve.  Mr. Kaptrosky is a citizen of the State of Illinois and his address is 334 Circle Ln, Lake Forest, IL 60045.

## FACTUAL ALLEGATIONS

18.     Ticket Reserve, which was incorporated in 2001, touts itself as a proprietary Enterprise Software Company whose technology platform creates online markets for customized reservations and advance rights to high-demand live sporting and other entertainment events.

---

[1] RGT has learned that there is a Delaware corporation with the name of The Ticket Reserve, Inc. RGT has not been able to determine the precise relationship between the two entities, but Individual Defendant Harmon is the Chairman of its Board of Directors and Individual Defendant Kaptrosky is its Chief Financial Officer. On February 29, 2012, the Delaware corporation changed its name to Forward Market Media, Inc., which the Illinois Ticket Reserve actively uses in its marketing.

According to Ticket Reserve advertising, the sponsor of a live sporting event (*e.g.*, the Super Bowl, Final Four, *etc.*) can use Ticket Reserve's proprietary platform to create a forward market by offering fans the opportunity to purchase an option to acquire a ticket at face value if the team of their choice qualifies for the event.

19.    On July 8, 2005, in exchange for a payment to Ticket Reserve of $75,000, RGT acquired 250,000 common shares of Ticket Reserve. RGT made this investment based on representations made or ratified by the Individual Defendants concerning the financial health of the Company and its prospects for generation of future revenues. Specifically, Ash Narayan, with the knowledge and consent of the other Individual Defendants, portrayed Ticket Reserve as a stable, growing and lucrative investment opportunity.

20.    RGT has recently learned that Ticket Reserve was in fact cash strapped for years and unable to generate sufficient revenue to cover its operating expenses and other financial obligations. For example, a spreadsheet created by Kaptrosky in June 2010 and circulated to Harmon, Narayan, and Rudoy depicts "total requirements to fund arrearages" as $4,199,615 in addition to $760,000 in working capital requirements against an amount of $523,384 as "available funds for debt repayment." To compensate for the Company's lack of profitability, the Individual Defendants routinely solicited new investor money for Ticket Reserve, in the form of equity and debt investments, to cover those expenses and obligations, including making payments to earlier investors. While RGT has been a shareholder of Ticket Reserve, the Individual Defendants solicited millions of dollars in loans to Ticket Reserve from investors, with no reasonable basis to believe that Ticket Reserve's revenues could fund the repayment of those loans pursuant to their terms.

21.     In at least one instance, Ticket Reserve created loan amendments and backdated the documents to conceal the extent of the Company's default.

22.     Because Ticket Reserve did not generate sufficient revenue to fund its operations, much less repay the substantial debt it was incurring, the Individual Defendants repeatedly sought additional loans or investments from existing and new investors in order to repay preexisting debts. For example, an investor loaned $1,250,000 to Ticket Reserve in June 2008, with repayment due by December 19, 2008.  Between September 2008 and December 2008, Ticket Reserve made payments on the loan totaling over $150,000 using proceeds obtained from the sale of stock to other investors.  Then, in December 2008, Ticket Reserve made two loan payments totaling over $800,000 using funds loaned by other investors.  In fact, one of those payments, in the amount of $537,000, was made on the same day the new loan funds in that exact amount were wired to Ticket Reserve.  Ultimately, Ticket Reserve failed to pay off the total amount of the loan by the due date of December 19, 2008, and the loan (along with a loan extension fee) was paid off months later, with funds loaned by Individual Defendant Ash Narayan.  Narayan and Harmon then agreed to disguise two "finder's fee" payments to Narayan as repayments on Narayan's loan.

23.     Soliciting new investors' money for the express purpose of enabling Ticket Reserve to repay overdue obligations to previous investors was routine until at least January 2016, and totaled millions of dollars over the years.  Some examples of those transactions include the following:

> (a)     Using funds loaned to Ticket Reserve on October 1, 2009 from one investor to pay off loan from another investor on October 2, 2009 in the amount of $1,134,384;

(b)    Using funds loaned to Ticket Reserve on September 5, 2012 from one investor to pay off loan from another investor on the same day in the amount of $408,082;

(c)    Using funds loaned to Ticket Reserve by two different investors on August 7, 2014 to make a payment on loan from another investor the following day in the amount of $2,680,000;

(d)    Using funds loaned to Ticket Reserve by one investor on January 9, 2015 to make payments on loans from two other investors on January 12, 2015 in amounts totaling $400,000;

(e)    Using funds loaned to Ticket Reserve by one investor on February 20, 2015 to make a payment on loan from another investor on February 23, 2015 in the amount of $2,500,000;

(f)    Using funds loaned to Ticket Reserve by one investor on December 21, 2015 to make payment on loan from another investor on December 23, 2015 in the amount of $250,000; and

(g)    Using funds loaned to Ticket Reserve by one investor on January 26, 2016 to make payments on loan from another investor on January 28, 2016 in the total amount of $2,080,000.

24.    Because Ticket Reserve was so desperate for cash, the Individual Defendants often agreed to debt terms on behalf of Ticket Reserve that were extremely unfavorable and detrimental to the Company's long term survival prospects, including loans with exorbitant interest rates, excessive loan extension fees and security requirements that leveraged virtually all Company assets.

25.     For example, in December of 2012, Ticket Reserve executed a promissory note to an investor for over $12.8 million, with an interest rate of 8% and a maturity date of March 31, 2014.  Ticket Reserve amended the note twice, however, resulting in an extension until November 30, 2014.  In the first amendment, the maturity date was extended but the investor retained the right to call the loan at the end of any quarter.  As part of the last amendment, however, the investor agreed to waive that right in exchange for a cash payment of $110,000 and an increase of the interest rate to 11.75%.  This $110,000 was paid using funds received from another investor just one day prior.  As additional consideration, Ticket Reserve also issued a warrant to the investor for 500,000 shares of Company stock.  Ultimately, when Ticket Reserve failed to pay off the loan by the new maturity date, it executed a new Secured Promissory Note for $12.25 million with a maturity date of December 31, 2016 and which granted a security interest to the investor in all of the assets of the Company (subject to an identical security interest previously granted to another investor).  Over the years, Ticket Reserve granted similar security interests to multiple investors, often at the same time.

26.     The notes to Ticket Reserve's 2012 audited financial statements cited multiple other examples of promissory notes executed by Ticket Reserve on extremely unfavorable terms, including:

(a)     Promissory note for over $1.7 million secured by substantially all Company assets and the personal guaranty of a major stockholder and with an interest rate of 18%;

(b)     Promissory note for $350,000 secured by the personal guaranty of a major stockholder and with an interest rate of 17%; and

(c) Various unsecured promissory notes totaling over $1.3 million with interest rates varying from 8% to 20%.

27. The Individual Defendants allowed Ticket Reserve to rely almost exclusively on board member and Individual Defendant Ash Narayan to identify potential investors and lenders to fund the Company. In exchange for this service, and with the knowledge and participation of the other Individual Defendants, Ticket Reserve paid Narayan undisclosed compensation in the form of "finder's fee" cash payments and stock grants in exchange for securing new investments in the company. The undisclosed cash payments from Ticket Reserve to Narayan alone totaled at least $1.7 million, and he received a substantial amount of shares of Ticket Reserve stock in addition to the cash payments. Narayan owns at least 3,550,000 shares in Ticket Reserve and has the option to purchase an additional 1,000,000 shares, and it is likely that all of these were received as compensation. Ticket Reserve also executed a promissory note payable to Narayan for $1,000,000, purportedly representing director fees payable to Narayan. The note originally had a maturity date of December 31, 2013, but during the Company's 2013 audit, which was conducted in May and June of 2014, Narayan executed a backdated amendment to the note extending the maturity date so that Ticket Reserve could provide the backdated document to its auditors.

28. Harmon, Narayan, and Kaptrosky, with Rudoy's knowledge, disguised the finder's fee payments to Narayan through the creation of fictitious after the fact loan agreements. The Company then issued Form 1099s that reflect this accounting fiction, and in so doing enabled Narayan to avoid reporting these illicit payments as income. In 2013, Ticket Reserve executed two backdated promissory notes, the amounts of which match exactly the undisclosed "finder's fee" payments Narayan had already received, although the notes themselves do not mention the "finder's fee" payments. The note dated December 31, 2011 is in the amount of $413,000, which

matches the $325,000 Narayan received in 2010 and $88,000 received in 2011. The note dated December 31, 2012 in the amount of $1,008,000 matches the amounts of the payments from 2010, 2011, and 2012 ($595,000). The maturity date for both of these notes was December 31, 2015, and they have not been repaid. Narayan may have received other illicit and undisclosed compensation, which will only be revealed following a forensic examination of Ticket Reserve's accounts.

29.     In soliciting loans and other investments described above, the Individual Defendants made material misrepresentations and failed to disclose material information to investors concerning the financial condition of Ticket Reserve and the purpose of their loans and other investments.

30.     The Individual Defendants regularly misrepresented Ticket Reserve's financial health to investors. They portrayed the Company as a stable and lucrative investment opportunity. In reality, Ticket Reserve was cash-strapped and had operated at a loss for years. The Individual Defendants personally orchestrated numerous loans to the Company despite the fact that previous loans were unpaid and in default. The Individual Defendants procured investor money to fund the Company's sustained losses, all without the knowledge of the investors or of RGT.

31.     As an example of misrepresentations to RGT: in 2014 Narayan touted the financial health of Ticket Reserve to RGT management. He stated that the company was realistically valued at $200 million at that time. Through his service on Ticket Reserve's board, however, Narayan knew that Ticket Reserve's outside accountants had already concluded, in an audit report as of December 31, 2012, that there was "substantial doubt about [the company's] ability to continue as a going concern." That same conclusion was re-confirmed by the accountants in an audit report as of December 31, 2013 (issued in 2014). Also later in 2014, Narayan and Ticket Reserve's CEO,

Rick Harmon, discussed the fact that there was no buyer for the company, and that during a board meeting the previous year, the board concluded its stock was worth essentially zero. Narayan never told RGT or other investors about Ticket Reserve's financial problems. Instead, he consistently misrepresented that Ticket Reserve was a valuable company and on the cusp of a lucrative sale.

32.     The further examples below document the Individual Defendant's repeated pattern of seeking new investor funding in an attempt to prevent immediate financial collapse, and the stark difference between the Company's internal communications and its representations to investors.

(a)     On October 6, 2010, Kaptrosky sent Harmon a spreadsheet detailing the Company's capital requirements, stating "We have strung payments out as far as possible but certain items need to be funded immediately. Attached is an updated list of the critical items that we need to get paid ASAP." Harmon forwarded this email to Narayan and Rudoy, stating "we are facing a potentially damaging 24-48 hours. If you partners want me to give away the farm, I will go to some guys that are bloody. I just don't know how much blood we want to give at this pivotal time, but at the end of the day I've got to come up with a plan to immediately meet this very real challenge. It is genuinely serious." On October 10, 2010, a current investor loaned an additional $250,000 to Ticket Reserve.

(b)     In February 2010, in response to an email regarding the Company's immediate funding requirements, Narayan stated he would attempt to find investor funding and acknowledged that "I have been the lifeline on numerous occasions over the past couple of years." The investor that Narayan approached questioned Narayan

about the proposed investment, stating "So it looks like I've got to come up with $68K and take on $121K of debt for 3-years nonrecourse at 0% interest and I'll have 593,809 new shares of stock to my existing position and you're recommending that I do this given all that you know. Do I have it correct?" Narayan informed Harmon on a Friday that he confirmed his recommendation to the investor, to which Harmon replied "We absolutely need to get [investor's] wire in Monday[.]"  In March 2010, Harmon and Narayan drafted an email for this investor to send to other similarly situated current investors, which described the offering and stated "*While the Company is not now looking to raise capital*, and is not particularly interested in expanding the cap table (in fact quite the opposite as Rick discussed in our meeting), Rick reviewed with his GC, the question of whether in fairness and equity, all Series A holders should be offered the same exchange opportunity.  His position is that while the Company does not have an obligation to do so, at this time in the greater scheme of things, they can do this." (emphasis added)  Harmon's subsequent email to Narayan contradicts the assertion that the Company was not looking to raise capital: "Keep me posted as any specific commitments come in. Each day matters a great deal right now, and I will ask you to think about, as I am, putting a March 31 deadline on this . . . . even outside the capital there is justification to try and speed this up as best we can."

(c)     On February 22, 2012, Harmon described his request to Narayan for additional funding from an existing investor as a "fire drill," and stated "We must do everything necessary in order to get the $500K wired in today or absolutely

tomorrow at the latest." $500,000 from the existing investor was wired to Ticket Reserve on February 24, 2012.

(d)    In an April 28, 2015 email exchange between Harmon, Narayan, Rudoy, and Kaptrosky, Harmon told Narayan "WE NEED TO RAISE 400K ASAP." Narayan responded that he would try to raise this amount, and noted that he could probably raise some of this from investors whose strike warrants had expired. On April 30, 2015, Narayan sent an email to an investor stating "Given the strong likelihood of a favorable exit given the current investment banking activity, I inquired as to whether there was any opportunity to extend the expiration date of these grants. Unfortunately, after consulting the Company's counsel . . . they cannot do that . . . .[a]fter further consultation with the Company's CEO, CFO, tax advisors and counsel, they agreed that as an alternative, they can issue a new warrant for the same amount of shares and strike price on the condition that it is immediately exercised . . . .*[w]hile this is an immaterial amount of capital to the company, they are extending this offer to you and my other clients, in thanks for your historical support of the Company*. . . . I felt compelled to negotiate with the company on your behalf to at least provide the opportunity for you to possibly monetize the original warrant grant." (emphasis added).

(e)    In response to pressure from investors regarding repayments on their loans, Narayan and Harmon attempted to conceal the Company's inability to fulfill its obligations. In August 2010, Narayan asked Harmon about finding an investor to repay a loan, as "I need to get back to him with some specifics on timing -- vagueness that 'repayment is in the works' or 'pending' has him very frustrated."

In September 2011, Narayan and Harmon discussed the appropriate way to address another investor who expressed concerns about repayment of his loan, with Narayan stating that if the subject arises, "just give him some quick sound bites on the momentum on the licensing platform and the discussions with the investment bankers and private equity firms re: the strategy towards a shareholder liquidity event." In October 2011, Narayan told Harmon that this same investor "has become fairly agitated on this issue since it was represented that the note was short-term in nature and is now going on 3 years . . . . I can't continue to 'kick the can' down the street."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

33.    By reason of their positions as directors and officers of Ticket Reserve and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed and owe Ticket Reserve and its shareholders fiduciary obligations of good faith and loyalty, and were and are required to administer the Company's affairs for the common benefit of all shareholders and exercise their best care, skill and judgment solely in the interest of Ticket Reserve, and not in furtherance of their personal interest or benefit. The Individual Defendants were and are required to exercise the degree of care which a prudent individual, prompted by self-interest, would exercise in the management of his or her own affairs. The Individual Defendants were and are required to use their utmost ability to control and manage Ticket Reserve in a fair, just, honest and equitable manner and in a manner that preserved, rather than wasted, corporate property and assets.

34.    Each director and officer of Ticket Reserve owed and owes the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

35.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Ticket Reserve were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various representations made to potential investors and shareholders by Ticket Reserve.

36.     Because of their advisory, executive, managerial and directorial positions with Ticket Reserve, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Ticket Reserve.

37.     To discharge their duties, the Individual Defendants were required to exercise due care and reasonable and prudent supervision over the management, policies, practices and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Ticket Reserve were required to, among other things:

(a)     ensure that Ticket Reserve was operated in a diligent, honest and prudent manner in compliance with its legal obligations and requirements;

(b)     ensure that Ticket Reserve disseminated truthful and accurate statements to investors and potential investors regarding all matters, including but not limited to the true financial condition of the Company;

(c)     conduct the affairs of Ticket Reserve in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     remain informed as to how Ticket Reserve conducted its operations and financial matters;

(e)     upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(e)     ensure that Ticket Reserve was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

## BREACHES OF FIDUCIARY DUTIES

38.     The conduct of the Individual Defendants complained of herein involves not mere mistakes in business judgment, but a pattern of knowing and culpable violations of their obligations as directors and officers of Ticket Reserve, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

39.     The conduct of each Individual Defendant director or officer has been ratified by the remaining Individual Defendants who also served as directors or officers at all relevant times hereto.

40.     Moreover, at all times relevant hereto, the Individual Defendants were the agents of each of the other Individual Defendants and were at all times acting within the course and scope of such agency.

## DAMAGES TO TICKET RESERVE

41.     Ticket Reserve has been injured and has suffered substantial damages as a result of the Individual Defendant's wrongful conduct, as described herein.  Such injuries and damages include but are not limited to the following:

(a)     Destruction of the Company's market value and capitalization

(b)     Destruction of Ticket Reserve's credibility with investors;

(c)     Impairment of Ticket Reserve's ability to raise equity capital or debt on favorable

terms in the future;

(d)     Destruction of Ticket Reserve's corporate image and goodwill; and

(e)     Costs and purported obligations incurred from substantial compensation paid to

Individual Defendant Narayan in the form of finder's fees, stock in Ticket Reserve,

an option to purchase additional Ticket Reserve stock and a $1,000,000 promissory

note payable by Ticket Reserve.

## DEMAND FUTILITY

42.     Plaintiff did not make a pre-suit demand on the board of directors of Ticket Reserve

to pursue this action, because such a demand would have been a futile and wasteful act.

43.     At the time this action was commenced, upon information and belief, the board of

directors of Ticket Reserve consisted of directors Harmon, Narayan and Rudoy, all of whom are

Individual Defendants.

44.     Demand as to all Counts is excused as to Individual Defendants under the standard

established in *Rales v. Blasband* because a majority of the directors are incapable of evaluating the

demand using independent and disinterested business judgment.  634 A.2d 927, 934 (Del. 1993).

45.     As the recipient of illicit and undisclosed finder's fee payments, Ticket Reserve

stock and stock option and a $1,000,000 promissory note payable by Ticket Reserve, Narayan is

interested because he received a personal financial benefit not equally shared by the other

shareholders.  *See, e.g.*, *Conrad v. Blank*, 940 A.2d 28, 38 (Del. Ch. 2007) (finding demand futile

under *Rales* and holding that "the two directors who allegedly received backdated options, Sargent

and Anderson, are clearly not disinterested under *Rales*. . . . [t]his creates an unacceptable conflict

that restricts them from evaluating the litigation independently.").  The payments to Narayan were

19

unreported to the Internal Revenue Service and undisclosed to individual investors. As a consequence, Narayan is also interested because he faces substantial personal liability for tax evasion. In addition, Narayan faces substantial personal liability arising out of his bad faith misrepresentations to investors regarding the Company's financial condition and the true purposes for which investment was sought. These misrepresentations, examples of which have been detailed above, misled and induced investors to invest in Ticket Reserve. Narayan further faces liability for his breach of the duty of loyalty by recklessly creating an unsustainable debt structure and failing to act in the best interests of the Company. Given the personal financial benefit that Narayan received and the substantial personal liability he faces, Narayan is incapable of impartially considering a demand regarding his own unjust enrichment, misrepresentations, and role in miring the Company in debt.

46. Harmon is interested under *Rales* for his role in consenting to the compensation to Narayan and disguising the finder's fee payments to Narayan. *See, e.g.*, *Conrad v. Blank*, 940 A.2d at 40 (finding demand excused as to the members of the compensation committee that authorized the backdated option grants). Harmon was knowledgeable of and permitted the use of fictitious loan agreements to disguise the payments to Narayan. As a consequence of his participation in these actions, Harmon faces substantial personal liability for the failure to properly record these payments for tax purposes and for the creation of backdated promissory notes to disguise same. In addition, Harmon is interested because he faces substantial personal liability for his bad faith misrepresentation of the Company's financial condition to investors. *See, e.g. In re Cendant Corp. Derivative Action Litig*., 189 F.R.D. 117, 129 (D.N.J. 1999) (applying Delaware law and finding plaintiffs created reasonable doubt as to disinterestedness of the directors given pending class action suits, insider trading, disregard of accounting irregularities, and making false public filings).

20

By concealing the Company's financial distress and falsely portraying the prospects of a favorable exit, Harmon induced further investment and debt that threatened the Company's ability to survive.

47.     The third and final board member, Rudoy, is also interested under *Rales* because he was knowledgeable of the finder's fee payments to Narayan.  Rudoy was also fully aware of the Company's dire financial straits and constant attempts to secure new investor funding to cover preexisting debts. Even if this Court deems Rudoy disinterested, demand would still be futile because a majority of the board (Narayan and Harmon), are interested.

48.     Even if a majority of the other directors were not interested, Narayan dominates the board such that it lacks the independence necessary to exercise business judgment in relation to the demand.  Throughout the Company's history of liquidity crises, Harmon repeatedly sought Narayan's assistance in obtaining new investments to stave off the collapse of the Company. Narayan consistently obtained such funding, and without his efforts it appears unlikely that Ticket Reserve would be in existence.  As a consequence, the other members of the board are beholden to and reliant on Narayan to a degree that makes independent judgment - particularly as it relates to Narayan's actions - impossible.  In addition, Harmon also dominated the board in his capacity as Chief Executive Officer and Chairman.  Harmon's position of leadership and authority in relation to board members such as Rudoy is particularly relevant given the small size of the board. At all relevant times, Harmon acted as the primary driver of the Company's policy and direction. Given the degree of control he exercised, it is unreasonable to expect that any disinterested directors would be capable of evaluating the demand independently.

49.     The Individual Defendants' personal financial gain, and/or substantial potential liability, make it clear that a majority of the board is interested under *Rales*.  As there is sufficient cause to doubt that a majority of the directors could set aside their own personal interest and

evaluate a demand using independent and disinterested business judgment, demand is futile and therefore excused.

## CAUSES OF ACTION

### Count I
### Against All Individual Defendants for Breach of Fiduciary Duty

50.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

51.     Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky owe and owed to the Company fiduciary obligations of good faith and loyalty, and were and are required to administer the Company's affairs for the common benefit of all shareholders and exercise their best care, skill and judgment solely in the interest of Ticket Reserve, and not in furtherance of their personal interest or benefit.  The Individual Defendants were and are required to exercise the degree of care which a prudent individual, prompted by self-interest, would exercise in the management of his or her own affairs.  The Individual Defendants were and are required to use their utmost ability to control and manage Ticket Reserve in a fair, just, honest and equitable manner and in a manner that preserved, rather than wasted, corporate property and assets.

52.     The conduct of Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky set forth herein constitutes intentional, reckless, or negligent breach and disregard of the fiduciary duties they owed to Ticket Reserve.

53.     Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky breached their fiduciary duties by misrepresenting material information regarding the Company's financial condition to investors and by concealing the true purposes for which loans and other investments were sought.  *See generally In re Holler*, 187 B.R. 622, 639 (Bankr. C.D. Ill. 1994) ("Under Illinois law, corporate directors have fiduciary duties of good faith, loyalty, and honesty to the corporation

and to the shareholders of that corporation."); *Hill v. State Farm Mut. Auto. Ins. Co.*, 166 Cal. App. 4th 1438, 1490 (2008) (applying Illinois law in class action against insurer and citing Delaware case for the proposition that "directors owe a duty to honestly disclose all material facts when they undertake to give out statements about the business to stockholders.") (quotation and citations omitted); *Malone v. Brincat*, 722 A.2d 5, 10-11, 14 (Del. 1998) (holding that "[w]hen the directors are not seeking shareholder action, but are deliberately misinforming shareholders about the business of the corporation, either directly or by a public statement, there is a violation of fiduciary duty." The Delaware Supreme Court framed the issue as "whether [the directors] breached their more general fiduciary duty of loyalty and good faith by knowingly disseminating to the stockholders false information about the financial condition of the company. The directors' fiduciary duties include the duty to deal with their stockholders honestly. Shareholders are entitled to rely upon the truthfulness of all information disseminated to them by the directors[.]"). As detailed in the preceding paragraphs, Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky had full knowledge of the Company's severe lack of liquidity and ever-increasing inability to repay earlier investors. Despite this, the Individual Defendants continued to represent that the Company was viable and poised for a favorable exit. They even went so far as to represent that the Company did not need capital, but was essentially offering the option of additional investment as a favor to existing investors. When pressed by investors about loans that were significantly in default, the Individual Defendants again concealed the true nature of the Company's finances. These misrepresentations constitute a clear breach of the Individual Defendants' fiduciary duties of good faith and loyalty, and resulted in significant harm to the Company. Such harm includes, but is not limited to, loss of the Company's market value, loss of

credibility with investors, inability to obtain future investor funding, and damage to the Company's image and goodwill.

54. Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky also breached their duty of loyalty by intentionally and recklessly incurring debt obligations with full knowledge of the Company's inability to repay these obligations. *See, e.g. F.D.I.C. ex rel. Wheatland Bank v. Spangler,* 836 F. Supp. 2d 778, 790 (N.D. Ill. 2011) ("Illinois law permits [a] claim for breach of the duty of loyalty when it hinders the entity's continued operations, even if the wrongdoer does not derive a personal benefit."). The Individual Defendants were fully aware that the Company was unable to sustain its normal costs of operation, let alone make payments on its myriad of outstanding debt obligations. Incurring additional debt ultimately served only to amplify, not remedy, the Company's liquidity crisis. The unsustainable debt structure that resulted from the Individual Defendants' conduct directly threatened and hindered Ticket Reserve's ability to continue its operations. In so doing, Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky failed to act in the best interests of the Company and breached their duty of loyalty.

55. Defendant Ash Narayan breached his fiduciary duties of good faith and loyalty by accepting finder's fee payments, shares of stock in Ticket Reserve, an option to purchase additional Company stock and a $1,000,000 promissory note payable by Ticket Reserve. Narayan further breached his fiduciary duties in that the finder's fee payments caused harm to the Company by depleting sorely needed assets, the issuance of stock diluted the interests of other investors and the promissory note in his favor helped create a debt structure that Ticket Reserve could not repay. These payments and other benefits reflect Narayan's focus on maximizing his own personal gain without regard for the financial condition of the Company or the risk to the new investors he

24

solicited.  On all levels, Narayan failed to fulfill his fiduciary obligations and failed to act in the best interests of the Company.

56.    Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky also breached their fiduciary duties by concealing the illicit "finder's fee" payments to Narayan through the creation of fictitious loans and the failure to report these payments as income.  These payments, along with the shares of stock, stock option and $1,000,000 promissory note, were also concealed from the investors that Narayan solicited.  Such conduct represents a clear violation of the duty to act in good faith and honesty.  Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky further acted in bad faith by concealing the extent of the Company's defaults through the creation of a backdated loan agreement regarding the finder's fees and a backdated amendment extending the maturity date of the $1,000,000 promissory note.

57.    As a direct and proximate result of the breaches of fiduciary duties by Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky, Ticket Reserve has sustained and continues to sustain significant damages.  In particular, the Company has continued to accumulate debt that it is unable to repay and that jeopardizes the Company's ability to operate.

58.    As a result of the misconduct alleged herein, Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky are liable to the Company.

**Count II**
**Against All Defendants for Breach of Due Care and Gross Mismanagement**

59.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

60.    By their actions alleged herein, Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ticket Reserve.  Because Individual Defendants

25

Harmon, Narayan, Rudoy and Kaptrosky acted in bad faith, they are not entitled to the protection of the business judgment rule. They are further not entitled to the protection of the business judgment rule because their conduct constitutes breach of the duty of due care. In addition, Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky committed gross mismanagement of the Company.

61. Ticket Reserve operated at a loss for years and was consistently past due on its obligations, including obligations such as payroll, payments to vendors and other third parties, taxes, and general operating costs. Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky were aware of the Company's repeated cycle of liquidity crises and yet completely failed to create a strategy to address and rectify this situation. Rather, the Individual Defendants' "plan" was to repeatedly enlist Ash Narayan to solicit new investor funding as a short-term "solution" that only served to put the Company in even greater debt. Frequently, such action occurred only well after the Company had already defaulted on obligations such as investor loans. The Individual Defendants did not have a long-term plan as to how the Company would repay the debt it incurred, instead they recklessly pinned all of their hopes on the prospect of a lucrative sale of the Company. Given the reality of the Company's situation and its repeated failure to secure such an exit, such conduct amounts to willful blindness and reckless disregard for the best interests of Ticket Reserve. The actions of Individual Defendants Harmon, Narayan, Rudoy, and Kaptrosky represent a complete failure of the duty to exercise the degree of care and informed due diligence required of a corporate director. *See, e.g., F.D.I.C. ex rel. Wheatland Bank v. Spangler*, 836 F. Supp. 2d 778, 792 (N.D. Ill. 2011) (holding plaintiffs sufficiently alleged breach of the duty of care given board members who "disregarded regulatory warnings of unsafe lending practices and monthly reports reflecting dangerous loan concentration and excessive growth, failed to follow the

bank's business plans and loan policies, and took no action to reform underwriting practices in response to criticism.").

62.     In light of the Company's long history of inability to make a profit and repay its loans, the Individual Defendants' reliance on these loans to keep Ticket Reserve afloat also constitutes gross mismanagement. This mismanagement is amplified by the fact that the Individual Defendants approved the loans on terms highly unfavorable to the Company, including exorbitant interest rates and leveraging virtually all of the Company's assets.

63.     On multiple occasions, Narayan acknowledged the Company's gross failures of management. In May 2012, while discussing an overdue loan with Harmon, Narayan stated "If you recall he lent TTR money on a then promised 90 day basis to cover the Super Bowl ticket uDibz fiasco so needless to say he has been patient for 3+ years." In January 2014, Narayan addressed the Company's failed attempt to engage the Super Bowl market as follows: "One thing is absolutely clear - we can and never [will] do an ad spend ever again and we can absolutely positively never purchase tickets in the secondary market. Makes no sense to LOSE money ever in a market. We are supposed to be a for profit enterprise . . . . Forecast for the next 6 months is equally disappointing." Also in January 2014, Narayan questions Kaptrosky about revenue projections, stating "[i]n the early projections, how did we ever think that our portion of the revenue split could amount to $600K? Was that wishful thinking?" These internal discussions make the Company's misleading representations to investors and reckless reliance on the prospect of a lucrative exit all the more egregious and inexcusable.

64.     As a direct and proximate result of the breach of the duty of care and gross mismanagement by Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky, Ticket Reserve has sustained significant damages, including further depletion of the worth of the

Company and shareholders' investments. Individual Defendants Harmon, Narayan, Rudoy and Kaptrosky are liable to the Company for such damages.

65.     Plaintiff on behalf of Ticket Reserve has no adequate remedy at law.

### Count III
### Against Individual Defendant Ash Narayan for Unjust Enrichment

66.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

67.     As described above, while serving as a member of Ticket Reserve's board of directors, Ash Narayan received inappropriate and undisclosed payments in the form of "finder's fees" and stock shares in exchange for securing equity investments and loans for Ticket Reserve. Narayan also received an option to purchase additional shares of stock in Ticket Reserve and a promissory note payable to him by Ticket Reserve for $1,000,000 in purported director fees.

68.     Narayan was unjustly enriched by such payments and other benefits.

69.     Had the Individual Defendants complied with all applicable laws, and had proper internal controls in place, Narayan would not have received the incentive-based compensation and benefits that he did.

70.     Narayan, through his self-dealing and breaches of fiduciary duties that led to payment of the finder's fees and other benefits, has significantly impaired the long-term profitability, reputation, and operation of Ticket Reserve.

71.     As a result, the finder's fees and other benefits paid to or conferred on Narayan were inequitable, Narayan was unjustly enriched, and such fees and benefits should be returned to the Company.

72.     To remedy Narayan's unjust enrichment, this Court should order him to disgorge all finder's fee payments that he received from Ticket Reserve, transfer any Ticket Reserve stock

and stock options in his possession back to the Company and release Ticket Reserve from all obligations under the $1,000,000 promissory note.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in Ticket Reserve's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Ticket Reserve and that Plaintiff is an adequate representative of the Company and its similarly situated shareholders;

(b)     Declaring that the Individual Defendants have breached their fiduciary duties to Ticket Reserve;

(c)     Determining that the Individual Defendants have committed breach of the duty of due care and gross mismanagement;

(d)     Determining and awarding to Ticket Reserve the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon;

(e)     Directing Ticket Reserve and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Ticket Reserve and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper corporate governance policies:

        (i)      a proposal to strengthen the board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

        (ii)     a provision to permit the shareholders of Ticket Reserve to nominate at least three candidates for election to the board; and

        (iii)    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(f)     Directing Ticket Reserve to provide an accounting with respect to all allegations set forth in this complaint and to provide the books and records related thereto;

(g)    Determining and awarding to Ticket Reserve exemplary damages in an amount necessary to punish Individual Defendants and to make an example of such defendants to the community according to proof at trial;

(h)    Awarding Ticket Reserve restitution from the Individual Defendants, and each of them;

(i)     Disgorging Narayan of all payments from Ticket Reserve and all shares of stock and stock options in Ticket Reserve that he received from the Company;

(j)     Releasing Ticket Reserve from all obligations under the promissory note executed by Ticket Reserve in favor of Narayan;

(k)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(l)     Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a jury trial.

Respectfully submitted,

RGT HOLDINGS, INC.,

By: /s/ Claire Gorman Kenny
    One of its attorneys

**MOIRANO GORMAN KENNY, LLC**
[*LOCAL COUNSEL*]

Michael H. Moirano
Claire Gorman Kenny
Stephen A. Gorman
135 S. LaSalle St., Suite 3025
Chicago, Illinois 60603
(312) 614-1260
mmoirano@mgklaw.com
cgkenny@mgklaw.com
sgorman@mgklaw.com

**BAKER BOTTS L.L.P.**
[*PRO HAC VICE MOTIONS TO BE FILED*]
Van H. Beckwith
  Tex. State Bar No. 02020150
Kevin M. Sadler
  Tex. State Bar No. 17512450
David Arlington
  Tex. State Bar No. 00790238
Christopher Norfleet
  Tex. State Bar No. 24070338

2001 Ross Ave., Suite 600
Dallas, Texas 75201
Tel: 214.953.6500
Fax: 214.953.6503
van.beckwith@bakerbotts.com
kevin.sadler@bakerbotts.com
david.arlington@bakerbotts.com
christopher.norfleet@bakerbotts.com

**ATTORNEYS FOR PLAINTIFF**
**RGT HOLDINGS, INC.**

31

## VERIFICATION OF COMPLAINT

I, Mark C. Griege, declare in accordance with Federal Rule of Civil Procedure 23.1, under penalty of perjury, that the following statements are true and correct:

1. I am President of RGT Holdings, Inc., and am duly authorized to make this verification as its agent;

2. RGT Holdings, Inc. is a shareholder in The Ticket Reserve, Inc. and has been a shareholder since July 8, 2005;

3. I have read the Verified Shareholder Derivative Complaint ("Complaint") and am familiar with the allegations and statements contained therein; and

4. To the best of my knowledge, information and belief, the facts set forth in the Complaint are true and correct based on my personal knowledge or based on information provided by RGT employees and/or counsel.

Executed this _17th_ day of May, 2016.

_____
Mark C. Griege
President, RGT Holdings, Inc.

1