IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RGT HOLDINGS, INC., derivatively on behalf of TICKET RESERVE, INC., <br><br> Plaintiff, <br><br> v. <br><br> RICHARD M. HARMON et al. <br><br> Defendants. | No. 16-CV-05457 <br><br> Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

Plaintiff RGT Holdings, Inc., ("RGT") has filed a verified shareholder derivative complaint against The Ticket Reserve, Inc., ("Ticket Reserve") and several of its officers. It alleges various breaches of fiduciary duty going back to July 8, 2005 and claims the diversity jurisdiction of this Court under 28 U.S.C. § 1332. However, the defendants contend that diversity is lacking because both RGT and defendant Richard Harmon are citizens of Texas. RGT's Texas citizenship is uncontested. Upon reviewing the parties' extensive submissions, the Court determines that Harmon is also a Texas citizen. Therefore, the defendants' motions to dismiss for lack of subject matter jurisdiction are granted.

## BACKGROUND

Plaintiff RGT Holdings is incorporated in Texas and has its principal place of business in Dallas, Texas. Compl. ¶ 12. It has held stock in Ticket Reserve since July 8, 2005. *Id*. Defendant Richard Harmon is the Chief Executive Officer of Ticket Reserve. *Id*. at ¶ 14. The Complaint alleges that Harmon is a citizen of Illinois. *Id*. However, the defendants challenge this assertion, arguing Harmon is actually a Texas citizen. Since the crux of the motions is where Harmon is a citizen, the Court will now focus on the affidavits and extensive documentation submitted by both parties.

**I. Harmon's Contacts with Texas**

Richard Harmon resided in Illinois from 1998 until December 2010. First Harmon Decl. ¶ 3, ECF No. 19-1. He had previously resided in Texas for some period of time, during which he obtained a bachelor's degree and MBA from the University of Texas. *Id*. at ¶ 14. In January 2011, Harmon relocated to Universal City, Texas (near San Antonio) for two reasons. *Id*. at ¶ 4. First, he wanted to take care of his elderly stepfather (who had helped raise him); second, he wanted to work (for Ticket Reserve) in Austin, Texas. *Id*. at ¶ 6. According to his affidavit, Harmon believed Ticket Reserve would fit in well in Austin's technology industry and a presence there would help Ticket Reserve recruit employees and gain access to partnerships and other resources. *Id*. at ¶ 12. After his 2011 move, Ticket Reserve considered Harmon to be employed in Texas and paid unemployment taxes to Texas. *See* Kaptrosky Decl. ¶ 5-6, ECF No. 19-2.

Within a month of moving to Texas, Harmon obtained a Texas driver's license. *See* First Harmon Decl., Ex. A. In February 2011, he also registered to vote in Texas. *See* First Harmon Decl, Ex B. According to Harmon's declaration, he voted while living in San Antonio. First Harmon Decl. ¶ 8. In March 2012, Harmon served on a San Antonio jury. *See* First Harmon Decl. Ex. C.

In September 2012, Harmon's stepfather was moved into a "care facility" and Harmon moved to Austin, Texas. First Harmon Decl. ¶ 10. He has lived at the same address, which is a condominium, since 2012 and states he has "no plans or intention to leave." *Id*. The condo is leased to Ticket Reserve's business alias (Forward Market Media), with the "tenant" section of the lease stating "Forward Market Media, Inc. c/o Richard Harmon." Pl.'s Ex. D, ECF No. 34. It appears that Ticket Reserve paid the rent on the condo, rather than Harmon. *See* Pl.'s Ex. F.

Harmon stated in an email that the condo "[g]ets lots of use as a company meeting place," but he also appears to have been in control of who used the condo at any time. *See* Pl.'s Ex. G. Harmon, who appears to travel frequently for work, often allowed visiting family and friends to stay in the condo while he was out of town. *See* Pl.'s Ex. H (allowing a friend to stay when he could not find a hotel room), Ex. GGG (emailing to see if mother-in-law will be using the condo). For example, Harmon's son John stayed at the condo with one of his friends over his birthday weekend. *See* Pl.'s Ex. J.

Harmon registered to vote in Austin when he moved there in 2012 and has voted in Austin. First Harmon Decl. ¶ 11. Harmon has two cars registered in Texas, one of which was purchased in Texas. *Id*. at ¶ 17. Harmon maintains a Northern Trust bank account (which he previously had in Chicago) with his Austin address. *Id*. at ¶ 18. Harmon's federal tax filings reflect a Texas address and he has not filed an Illinois income tax return since 2010. *Id*. at ¶ 19. Harmon stated in his declaration that he spends "at least 60% of the time" that he is not traveling for business in Texas, with the remainder divided between Illinois and California. *Id*. at ¶ 21.

Harmon has at least four children. His daughter Lisa lives in Houston, Texas, along with her four children. *Id.* at ¶ 16. Harmon states that his move to Texas was partly in order to be closer to his grandchildren. *Id*. Harmon's son John attended the University of Texas in Austin from 2012-2016, where he received in-state tuition after his first year. Second Harmon Decl. ¶ 4, ECF No. 38-1. The record indicates John may now be attending graduate school in California. *See* Pl.'s Ex. WWW. Harmon's daughter Tanya appears to also live in California. *See* Pl.'s Ex. YYY ("our daughter Tanya is now a 10+ year successful teacher in the San Francisco public school system"). Harmon's son Matthew appears to currently attend Kansas University. *See* Second Harmon Decl. ¶ 5. As of 2016, Harmon's wife Sue is in the process of relocating to

Texas permanently, including putting their Illinois house on the market in August 2016. First Harmon Decl. ¶ 20; Second Harmon Decl. ¶ 3. Although it is not mentioned by either party, a March 2016 letter indicates that Harmon was seeking a mortgage in order to purchase a home in Austin during 2016. *See* Pl.'s Ex. DDD.

In terms of community activities, Harmon states he is active in the University of Texas' athletic department and serves on their Development Board. First Harmon Decl. ¶ 15. The record bears that involvement out, reflecting at least one large donation and several conversations and meetings with University of Texas staff. *See, e.g.,* Pl.'s Ex. BBBB (confirming donation), Ex. ZZZ (referencing visit earlier in the week), Ex. YYY (confirming attendance at University luncheon). Harmon also maintains at least passing ties with a few Illinois organizations, which will be discussed in the section below on his ties to Illinois.

## II. Harmon's Ties to Illinois

When Harmon moved to Texas, his wife Sue stayed behind in the Lake Forest, Illinois home that they jointly own (although the house has since been placed on the market). Second Harmon Decl. ¶ 3. Both of his sons were at that point in school in Lake Forest, and they remained there through their high school graduations (which took place in 2012 and 2014). *Id*. at ¶ 4-5. After Harmon's move to Texas, the Harmon family continued to celebrate holidays in Lake Forest. *See* Pl.'s Ex. U (stating the "Harmon family will be in Lake Forest for Thanksgiving"). These trips, however, were generally brief. For example, in November 2014, Harmon emailed a contact to state that he was in Illinois for Thanksgiving but would be in London on business the following Monday. *See* Pl.'s Ex. X. Similarly, Harmon indicated in a December 2015 email that he would be back in Austin the Monday following Christmas. *See* Pl.'s Ex S. A 2013 email shows Harmon leaving Chicago to go to Palm Springs the day after

4

Christmas that year. *See* Pl.'s Ex Y. Another 2012 email shows Harmon trying to connect with a friend in Illinois while he was in town for the holidays. *See* Pl.'s Ex. Z. Similarly, Harmon's emails show the family coming in to Illinois for Matt's high school graduation. *See* Pl.'s Ex. BB-CC. Harmon repeatedly refers to Lake Forest as "home" in his emails. *See, e.g.,* Pl.'s Ex. OO (telling son to "bring that home with you"), Ex. PP ("I need to make a deposit there before coming home"), Ex. WW ("I arrive in Denver tomorrow, Thursday afternoon and return to Chicago (my home base) Saturday afternoon"), Ex. IIII ("I really want to come home on the 19th"). Harmon, however, has also referred to Austin as "home." *See* Pl.'s Ex. YYY ("Once our son Matthew graduates this spring from high school in Lake Forest, we'll start spending considerably more time in our home in Austin.").

Harmon also continued to have a number of relationships in Illinois with local business and organizations. For example, Harmon continued to contribute to his church in Lake Forest. *See* Pl.'s Ex. DD. Harmon acknowledges in his affidavit that Sue has continued to attend their Lake Forest church, and that Harmon attends functions when he is in town, "which tends to occur around the holidays." Second Harmon Decl. ¶ 7. Harmon has also continued to belong, as an out of state member, to a golf club in Lake Forest, where he occasionally entertains and conducts business. *See* Pl.'s Ex Q (expense report showing Conway Farm Country Club entertainment expenses), Ex. KK (invoice for private party held at the Country Club), Second Harmon Decl. Ex. B (showing 2012 request to change membership to "National" category "restricted to those whose residence and principal place of business" are "more than 100 miles from the Club"). Harmon also continues to use the same accountant and doctor.[1] *See* Pl.'s Ex. LL

---

[1] The Court further notes that these emails indicate Harmon had some difficulties setting up appointments with these Illinois providers. For example, one email to his accountant says he does not expect to be back in Lake Forest for 15-20 days while another shows Sue and Harmon

5

(setting up meeting with accountant), Ex. RR (scheduling dental appointment), Ex. SS (scheduling doctor's appointment).

Harmon also has several other miscellaneous ties to Illinois. An internet database report also indicates that Harmon may own a Land Rover that still is registered in Illinois and has Illinois plates. *See* Pl.'s Resp. at 13. Harmon and his wife seem to maintain a bank account at a Lake Forest bank. *See* Pl.'s Ex. PP. One of Harmon's credit cards still uses his Lake Forest home as its billing address. *See* Pl.'s Ex. NN. Harmon continues to use his Illinois area code cell phone number. *See* Pl's Ex. WW.

## DISCUSSION

When the facts that determine diversity jurisdiction are contested, the plaintiff must "establish those facts by a preponderance of the evidence." *Muscarello v. Ogle County Bd. of Comm'rs*, 610 F.3d 416, 424 (7th Cir. 2010). "Jurisdiction depends on citizenship at the time a case begins," which the Seventh Circuit has construed as the filing of the lawsuit (here, May 2016). *Denlinger v. Brennan*, 87 F.3d 214, 216 (7th Cir. 1996). For an individual person, citizenship is determined by domicile, which entails "physical presence in a state, with intent to remain there." *Id*. No single factor determines domicile; rather, courts consider factors such as "current residence, place of employment, location of property, voter registration, driver's license registration, and payment of taxes." *Newell v. O & K Steel Corp.*, 42 F. App'x 830, 833 (7th Cir. 2002); *see also 24 Hour Fitness USA, Inc. v. Bally Total Fitness Holding Corp.*, No. 08 CV 3853, 2008 WL 4671748, at *3 (N.D. Ill. Oct. 21, 2008) ("While no individual factor is dispositive in determining domicile, courts rely on a variety of factors in their analyses, including

---

putting off meeting for several weeks due to scheduling difficulties. Pl.'s Ex. LL. Another email shows Harmon and Sue attempting to coordinate all of his medical appointments to be on one day. *See* Pl.'s Ex. RR.

current residence, location of belongings and personal property, voter registration, driver's license and vehicle registrations, place of employment, presence of family members, and extent of social involvement in the surrounding community, among others.").

**I. Jurisdictional Discovery**

As an initial matter, the Court notes that RGT asked (as an alternative to denying the motion to dismiss outright) for jurisdictional discovery under Rule 26(b)(1). RGT would like to take depositions of Harmon and Kaptrosky (another member of Ticket Reserve's board) as well as receive discovery on more than 20 different topics. *See* Pl.'s Ex. VVVV. These topics include the amount of money Harmon donated to organizations in California, Illinois, and Texas (and whether these were funded or reimbursed by Ticket Reserve), all Harmon's "personal hobbies and activities related to these hobbies," "all organizations, events, and other community involvement (e.g. religious, educational, charitable, social) that you participated in in California, including the dates, location, approximate amount of time spent on each organization or activity, and whether this activity was related to Ticket Reserve business," the date and location of every medical, dental, therapy, legal, and financial appointment Harmon has had since 2011, and "all sources (including financial institution, account number and accountholder's name) utilized for payment of business expenses" and the relevant amounts. *Id*. RGT also requests documents regarding where Harmon's son Matt attended high school,[2] Harmon's cell phone bills, and monthly account statements for all of Harmon's personal banking transactions. *Id*.

Plaintiffs do not have an automatic right to discovery pertaining to personal jurisdiction. *See Andersen v. Sportmart, Inc.*, 179 F.R.D. 236, 241 (N.D. Ind. 1998). A plaintiff must first establish a colorable *prima facie* case of jurisdiction, especially where the plaintiff has already

---

[2] Apparently Matt's resume is insufficient proof. *See* Pl.'s Ex. P.

had extensive access to documents. *See GCIU-Employer Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1026 (7th Cir. 2009) (jurisdictional discovery not required for personal jurisdiction inquiry when plaintiff had already reviewed documents and depositions in bankruptcy proceeding); *Sanderson v. Spectrum Labs, Inc.*, 248 F.3d 1159 (7th Cir. 2000) (court not obligated to allow jurisdictional discovery into venue). Here, RGT was able to review a large volume of documents, including five years of Harmon's emails and Ticket Reserve's business records, because it has access the record of the SEC investigation and receivership action pending in the Northern District of Texas. *See* Pl.'s Ex. B. This alone mitigates the need for jurisdictional discovery, as does the fact that the parties do not appear to dispute any material facts (rather, they simply disagree over the relative importance of certain facts).

Furthermore, these requests have no relevance to establishing Harmon's domicile. For example, Harmon has conceded that his son attended high school in Lake Forest, so the location of his school and supporting documents could not possibly be relevant. Similarly, the manner in which Harmon paid for his business expenses may go to the merits of RGT's fiduciary duty claims, but they will shed no light on whether he intended to remain permanently in Texas. No party has suggested Harmon is domiciled in California, so the Court fails to see the relevance of the California-related requests. The Court need not allow discovery into issues "irrelevant to the determination of whether the court has subject-matter jurisdiction on the basis of diversity." *Harms v. Pebble Creek, LLP*, No. 1:14-CV-01073-DKL, 2015 WL 5009238, at *2 (S.D. Ind. Aug. 20, 2015). In this case, many of the desired topics of discovery (such as Harmon's financials and the payment of his business expenses or his cell phone bills) are relevant not to jurisdiction but to the merits of RGT's case.

Most importantly, RGT has failed to set forth a *prima facie* case for jurisdiction (as described in greater detail below). In its complaint, RGT merely alleged that Harmon was an Illinois citizen who resided at his Lake Forest home. *See* Compl. ¶ 14. When confronted with evidence that he did not, in fact, reside at that home and was not a resident of Illinois, RGT cobbled together a hodge-podge of minor contacts that in no way contradicted Harmon's story. Without such a *prima facie* case, discovery would only harass the defendants and force the Court to preside over discovery in a case over which it lacks jurisdiction. *See Wilson v. The Master's Miracle, Inc.*, No. 05 C 6590, 2006 WL 163020, at *3 (N.D. Ill. Jan. 19, 2006) ("without jurisdiction we have no authority to preside over discovery matters"). Therefore, the Court denies RGT's request for discovery.

**II. Harmon is a Citizen of Texas**

The Seventh Circuit has long acknowledged that determining an individual's domicile, especially for those with lives in multiple states, can be a complex and difficult endeavor. *See Galva Foundry Co. v. Heiden,* 924 F.2d 729, 730 (7th Cir. 1991). It is clear that Harmon was physically present in Texas, so the question is whether he has demonstrated sufficient intent to remain there. *See Dakuras v. Edwards,* 312 F.3d 256, 258 (7th Cir. 2002) ("domicile is the place one intends to remain"). In this case, almost every factor courts have identified points in favor of Harmon's Texas citizenship or is a wash. Harmon has, for more than five years, resided in Texas. He has a Texas driver's licenses and has vehicles registered in Texas. He voted (and registered to vote) in Texas and files his taxes in Texas. He is considered by his employer to be employed in Texas, and his employer pays taxes there for that reason. He earned his undergraduate and graduate degrees in Texas and remains heavily involved with the University of Texas. *See Midwest Transit, Inc. v. Hicks*, 79 F. App'x 205, 208 (7th Cir. 2003) ("courts have tried to glean

intent from the following factors: current residence, voting registration and voting practices, location of personal and real property, location of financial accounts, membership in unions and other associations, place of employment, driver's license and automobile registration, and tax payments"). He also has a daughter, grandchildren, and a stepparent residing permanently in Texas, and a son who resided there for four years during college, and qualified for in-state tuition while attending school there.

That Harmon still has some connection to Lake Forest, where he lived for many years with his wife and family does not undermine his claim to Texas citizenship. Harmon is not required to have the same domicile as his wife. *See Muscarello v. Ogle County Bd. of Comm'rs,* 610 F.3d 416, 424 (7th Cir. 2010) (husband and wife with different domiciles). In this age of mobile careers, even the President of the United States lives apart from his family to avoid disrupting the education of his children. *See* Helena Andrew-Dyer, *Trump Confirms that Wife Melania and Son Barron Will Stay in New York After Inauguration*, CHI. TRIB. (Nov. 20, 2016, 5:09 PM), http://www.chicagotribune.com/news/nationworld/politics/ct-melania-trump-barron-trump-ny-20161120-story.html. Here, Harmon explained that he chose to move to Texas to assist his elderly stepfather and to improve his company's prospects. His wife stayed in Lake Forest, allowing their two children to finish high school and their house to gain more value. Like a good father and husband, Harmon tried to be home when he could, especially around holidays. It is natural for him to call the place where he raised his children "home," in the same way many adults say they are "going home" to their parents' or grandparents' for holidays.

Many of Harmon's behaviors make sense when considering his frequent work travel and his family's continued presence in Illinois. It makes sense for Harmon to leave one car (out of three) in Illinois for when he is there, and to continue to maintain a joint bank account and shared

accountant where his wife currently lives. For someone constantly on the road, it is also natural to have one's wife pack medical appointments into one day (as Harmon did when he saw his Illinois medical professionals) or try to catch up with friends during holiday visits. Such contacts do not evidence a desire or plan to return to residing in Illinois.

As one would expect of someone intending to remain in Texas, Harmon appears to be continuing to increase his activity in Texas as his sons grow up and move away from Illinois. In early 2016, Harmon appears to have been attempting to secure a mortgage to purchase a house in Texas. Later that year, he and his wife put their Lake Forest house on the market. In emails, Harmon admitted that he and his wife would be spending more time in Austin because his son Matt had graduated from high school. Many of the remaining details, such as a credit card with an out of date billing address and a cell phone with an Illinois area code, are virtually meaningless in today's age of mobility where almost no one changes their cell phone number (or email address) or remembers to update every account when they move.

Perhaps recognizing the weakness of their arguments, RGT attempts to cloak Harmon's actions in an "aura of fraud," accusing him of becoming a Texas resident to evade Illinois income tax or to receive in-state tuition for his son. *See Galva Foundry Co.*, 924 F.2d at 730. RGT has produced no evidence, however, that Harmon was in any way motivated to move by the prospect of tax benefits. Rather, it points to evidence that Harmon owned a condo in California that Ticket Reserve paid rent on and that Ticket Reserve did not pay its bills on time. *See* Pl.'s Resp. at 16-17. None of this demonstrates a plot on Harmon's part to evade state income taxes; if anything, it helps explain why Harmon might want to leave Illinois. In contrast, in *Galva* a longtime Illinois resident with a second home in Florida suddenly moved his residency to Florida within months of selling his stock in order to avoid paying taxes. *See Galva Foundry Co.*, 924

F.2d at 730. The court found an "aura of fraud" there because the events were clearly temporally related, and the individual had not changed "the manner or style of his life." *Id*. Here, Harmon changed his residency long-term, without any sudden change in financial circumstances, and radically altered the style of his life – leaving his wife and children back in Illinois while spending the majority of his time outside of work travel in Texas.

As to the in-state tuition argument, it is worth noting that chronologically this makes no sense. Harmon moved to Texas in January 2011, before his son likely knew where he would go to college (especially since the record shows University of Texas admissions decisions are released in late February, *see* Pl.'s Ex. ZZZ). Further, according to Harmon's declaration, they did not receive in-state tuition for his son's first year at the University of Texas. The only information that RGT points to is an email that Harmon sent to his wife and son, which says "on Sunday, let's pay the tuition" in response to an email about paying for student housing. *See* Pl.'s Ex. XXX. Far from suggesting a conspiracy to avoid tuition, this is simply a benign reminder to take care of bills. As a second attempt, RGT points to Harmon's unsuccessful attempts to help his younger son get admitted to the University of Texas. *See* Pl.'s Ex. DDDD (emails between Sue and Harmon discussing providing his son's resume to a University of Texas staff member). It's not clear how this relates to Harmon's residency, since it has nothing to do with his relocation or in-state tuition. The thrust of these University arguments and the tax argument appears to be that Ticket Reserve (and perhaps Harmon) did unsavory things with money, so the Court should assume that all of Harmon's actions were related to a dastardly plan to swindle and lie. The Court declines RGT's invitation to ignore the relevant facts.

\*   \*   \*

Domicile is where a person resides and intends to remain, determined by the totality of the circumstances. RGT has failed to carry its burden and demonstrate even a prima facie case (much less by a preponderance of the evidence) that Harmon is an Illinois citizen. Harmon is a Texas citizen, as is RGT. Therefore, the Court lacks jurisdiction over this case. The motions to dismiss for lack of subject-matter jurisdiction are granted.

Dated: March 13, 2017

John J. Tharp, Jr.
United States District Judge